### William GANCI, Petitioner,

v.

### Carl D. BERRY, Superintendent, Woodbourne Correctional Facility, and the People of the State of New York, Respondents.

#### No. 88 CV 2423.

United States District Court,
E.D. New York.

Dec. 20, 1988.

William Ganci, Woodbourne, N.Y., pro se.

Patrick Henry, Dist. Atty., Suffolk County, Riverhead, N.Y. (Michael J. Miller, Asst. Dist. Atty., of counsel), for respondents.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Petitioner seeks habeas corpus under 28 U.S.C. § 2254 (1982).

He was charged in Suffolk County, New York in two indictments for two bank robberies, one at the European American Bank, in Huntington Station, New York, on March 27, 1978, and the other at Central Federal Savings and Loan Bank in West Islip, New York on July 19, 1978. He was also charged in both indictments with criminal possession of stolen property. The indictments were consolidated for trial. The jury found him guilty of all charges, and the court sentenced him to concurrent terms, the longest of which was 12½ to 25 years.

The Appellate Division affirmed on January 23, 1981, and on March 25, 1981 the Court of Appeals denied leave to appeal. Thereafter petitioner applied under 28 U.S.C. § 2254 for habeas corpus, which was denied by Judge Pratt on January 7, 1982. Petitioner then brought two New York C.P.L. Article 440 motions, the first of which was later withdrawn and the second of which was denied. In none of the foregoing post-trial applications did petitioner raise the issue now urged.

On February 10, 1984 petitioner renewed his first Article 440 motion, contending that he had been denied a fair trial because material of which he had just learned had been withheld by the prosecutors although they were obligated under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to furnish it to defense counsel. The Suffolk County court held an evidentiary hearing on the motion and denied it on

November 27, 1984. The Appellate Division denied leave to appeal.

## I.

Respondent concedes that petitioner has exhausted his state remedies. He could not obtain an appeal as a matter of right from the denial of the Article 440 motion, but he did seek leave to appeal from the Appellate Division. He could not get further review because the Court of Appeals has held that it has no power to vacate a conviction based on newly discovered evidence. *People v. Crimmins*, 38 N.Y.2d 407, 381 N.Y.S.2d 1, 343 N.E.2d 719 (1975).

## II.

At the criminal trial the prosecution introduced evidence showing, in substance, the following.

At about 1:00 p.m. on March 27, 1978 a lone robber entered the European American Bank at the Walt Whitman Mall in Huntington Station. He announced a holdup and instructed everyone to put their hands on the counters in front of the tellers' windows. Pointing a shotgun at Deborah Yager, a bank service representative, and handing her what looked like a blue pillowcase, he told her to fill it with money. She proceeded to do so, emptying first her cash drawer and then the other tellers' unlocked drawers. At one point the robber told her to get money from the lower, second drawer, which contained bulk money or reserve cash. She could not do this because the drawer was locked.

Yager then emptied the cash drawers at the drive-in window station and put the bills, including $1000 in "bait" money, the serial numbers of which had been recorded, in the blue bag. She walked back to where the robber was standing at the end of the counter. He then noticed a canvas bag on the counter, and at his direction she placed it in the blue bag. The canvas bag contained unvalidated Series E savings bonds.

While this was going on, Lawrence Koenig, an employee of a store in the shopping center, came in to deposit receipts, carrying about $6,000 and checks. The robber held a gun to him and told him to turn over the money. He did, and the robber, after telling everyone to lie on the floor, left.

At trial the witnesses described the robber as wearing a rubber Halloween-type mask covering his whole face. The photographs taken by the bank camera show a mask with a large moustache, heavy eyebrows, a large straight nose, and prominent eyes, apparently painted on the mask. The hair looks like a wig. The shotgun and the bag appear clearly in the bank photograph of the robber as he left the bank, clad in a long dark coat and gloves.

The witnesses disagreed as to the robber's height and build. Koenig described him as 5 feet 3 inches to 5 feet 6 inches. Yager said he was between 5 feet 8½ inches to 5 feet 9 inches, as did Richard Gearns, the branch manager. Koenig thought the robber heavy-set or stout but dressed bulkily. Yager described him as slender. So did Gearns, adding that the coat was ill-fitting or loose.

While the robbery was in progress, Lisa Ann Sorrentino, a passenger in her aunt's car when they drove in to the drive-in window, saw a woman in the bank with her hands up and realized a robbery was in progress. They drove to another bank across the parking lot to call the police. While her aunt went inside to call, Sorrentino went outside to see if anyone came out of the European American Bank. She saw a man come from the bank door and walk quickly, apparently with a limp, through some cars. He wore a long dark coat and carried a blue bag. He had no mask but dark hair standing up on end at the back of his head. She testified she was between 50 to 70 feet away when she saw him. On the day of the robbery she picked out petitioner from a group of photographs, although she was only 80% certain. However, she positively identified him both in a line-up held in September 1978 and at trial.

One other witness, Kathryn Niccolls, a registered nurse, saw petitioner outside the bank at the time of the robbery. She had driven a co-worker to the bank at about 1:00 p.m. that day. She stayed in the car while her co-worker went inside to cash a

check. After about ten minutes Niccolls decided to see why her friend was delayed, and as she was getting out of the car she saw a man walking quickly with a distinctive gait across the parking lot. He wore a raincoat extending below the knee and carried a blue bag. The hair on the back of his head was standing up, and he walked to a green car with a dull finish.

Niccolls could make no identification from the photographs but positively identified petitioner when she viewed him in the September 1978 line-up.

From the bank photographs police witnesses testified that the gun was either a 12–gauge or a 16–gauge pump-action shotgun.

The robbery of the Central Federal Savings and Loan Bank commenced at about 10:00 a.m. on July 19, 1978, when Ben Battaglia pulled into the bank's parking lot and a van parked next to him. The driver of the van, wearing a mask, got out, grabbed Battaglia by the arm, and shoved him toward the bank, saying "This gun is behind you." Inside the bank the robber handed Battaglia a blue bag, told him to give it to the cashier, announced a holdup, and directed everyone to put their hands on the counter in front of the tellers' windows.

Battaglia handed the blue bag to Carol Falconer, a teller, while the robber stood at the end of the counter. Falconer then put in the bag all the cash, including "bait" money, from her top and, at the robber's demand, her second drawer. Three other tellers did likewise. Falconer then gave the bag back to the robber, who, after telling everyone to lie on the floor, left by a side door.

Some of the witnesses then got up and saw the van, which Battaglia recognized, leave the parking lot driven by the masked man.

Witnesses testified that the robber carried a rifle or shotgun and wore baggy blue denim overalls, a long-sleeved shirt, and gloves. His mask had a moustache, bushy eyebrows, and black bushy hair. The portion of his hair that looked like his own was dark. The witnesses estimated the robber to be between 5 feet 7 inches and 5 feet 9 inches tall and of stocky build.

The day after the robbery, petitioner went to another bank, Sunrise Federal Savings and Loan in North Babylon, and handed in a money order application for $564.35 in the name of his brother-in-law. Petitioner paid for the money order in cash, including four bills from the "bait" money.

A week later a Suffolk County Detective and agents of the Federal Bureau of Investigation (F.B.I.) conducted a search of the brother-in-law's home, found a 12–gauge pump-action shotgun, and arrested the brother-in-law. Later that same day petitioner, using another name, rented a safe deposit box at the Massapequa Branch of the Dime Savings Bank.

About a week thereafter, the detective and the agents, pursuant to a search warrant, searched petitioner's home and found 68 of the 150 ten dollar bills of the "bait" money from the Central Federal Savings and Loan. In addition they found a 12–gauge shotgun shell.

### III.

The material that petitioner now claims was wrongfully withheld from him consists of three reports of the statements of persons interviewed by the F.B.I. as a part of its investigation of the European American Bank robbery. Neither the Suffolk Police nor the Assistant District Attorneys had seen these F.B.I. reports. The County Court found after the hearing that this investigation was separate from that of Suffolk County and that the interviews of witnesses were conducted independently.

One F.B.I. report, dated April 6, 1978, recited that Steven Morthaneo, a teller at Emigrant Savings Bank, had described a person seen running from the European American Bank and entering a green van as "approximately 22–23 years of age with blonde hair."

A Suffolk County detective had interviewed Emigrant Savings Bank witnesses, including Morthaneo, but took no statements from them because he thought they were too far away from the scene of the crime to be reliable and useful. The Assistant District Attorney, after viewing a

photograph showing the distance between the two banks, agreed.

A second F.B.I. report, dated April 5, 1978, was of an interview with Christine Lewis, a teller at the European American Bank. She described the robber as approximately 40 years of age and about 5 feet 9 inches tall, with brown eyes.

A third F.B.I. report, also dated April 5, 1978, was of an interview with Diane Devine, a customer at the bank when the robbery occurred. She described the robber as approximately 5 feet 9 inches tall and said that "she took one quick look at him and noticed that his eyes were brown."

Petitioner contends that these three reports disclosed exculpatory evidence because he had dark not blond hair and blue not brown eyes. He says the District Attorney should have made inquiry of the F.B.I. to determine what material it had and turned over the reports.

■ Even as to evidence within the same government there are limits to what a prosecutor must furnish under the *Brady* rules. *May v. Hoke*, 87 Civ. 1307 (E.D.N.Y. Nov. 30, 1988) (Raggi, J.), and cases cited therein, at ____-____. A state prosecutor who does not have knowledge or possession of exculpatory material is not obliged by the *Brady* decision to find out if the F.B.I. has such material, particularly where the defendant has knowledge that the F.B.I. has investigated the case. *Cf. United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir.1973) (federal prosecution not obligated to obtain evidence from third parties), *overruled on other grounds, United States v. Henry*, 749 F.2d 203 (5th Cir.1984); *United States v. Horsley*, 621 F.Supp. 1060, 1066 (W.D.Pa. 1985), *aff'd* 831 F.2d 288 (3d Cir.1987) (federal prosecutor not required to get file from City of Pittsburgh); *accord, United States v. Harris*, 738 F.2d 1068, 1072 (9th Cir.1984) (federal prosecutor's position that he had no obligation to turn over tapes in state's possession not clearly erroneous).

■ The Suffolk County judge said in *dicta* that since the prosecutor knew of the F.B.I.'s investigation of the case they had an obligation to make a diligent inquiry to determine the existence of F.B.I. exculpatory material and to cause it to be made available to defendant. However, this comment was based in part on a 1979 amendment to C.P.L. Article 240, placing the burden on the prosecution to make a "diligent, good faith effort" to "ascertain the existence" of such material. No federal cases have apparently gone so far, and this court holds that the Suffolk County prosecutors were not required to furnish F.B.I. reports that they had never seen and that were not in their possession.

### IV.

■ Although the prosecutors had no obligation to find exculpatory material in the hands of the F.B.I. they had a duty to furnish exculpatory material in their own hands. Suffolk County detectives had interviewed both Christine Lewis and Diane Devine and received written statements from them. Lewis's statement includes a sentence reading "I could see through the mask that he had brown eyes."

Devine's statement included the following: "I didn't want to look at him because I was scaird (sic). He sounded very nervous. What little I saw of him it appeared to me that his eyes were brown."

The prosecutors decided that these witnesses were describing the eyes on the mask and that the statements therefore were not exculpatory. They did not turn them over to defense counsel.

An examination of the bank photographs suggests that it was plausible to assume that these two witnesses saw not the robber's eyes but those painted on the mask. Nevertheless defense counsel was entitled to pursue this matter himself. The statements were inconsistent with the fact that petitioner had blue eyes, and under the *Brady* decision the prosecutors should have furnished them.

### V.

■ The fact that statements might have been useful to the defense does not mean that the conviction is thereby subject to reversal on appeal or vacation on a col-

lateral attack. The question is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

The Suffolk County court determined after the evidentiary hearing that testimony by the witnesses, including the report reciting Morthaneo's description of the robber as having blond hair, was not reasonably likely to have affected the judgment of the jury. Since this court holds that the prosecutors were not obliged by the United States Constitution to turn over the F.B.I. reports, the federal question is whether testimony by Lewis and Devine, in accordance with their statements to the Suffolk County police that they thought the robber had brown eyes, would have been reasonably likely to change the result. Neither of these two witnesses saw the robber without a mask. From the bank photographs it appears that the eyes are painted on the mask (presumably with peep holes). Yager did not see the robber's eyes, although she dealt with him directly and at close range. The identifications by Niccolls and Sorrentino at the line-up were positive.

These factors make it seem highly unlikely that testimony about brown eyes behind a mask would have caused the jury to reach a different result. Moreover, the jury could have drawn a confirming inference from the evidence as to the robbery at the Central Federal Savings and Loan Bank. The perpetrator carried out that robbery in a fashion almost identical to the earlier robbery, to the extent of using a blue bag and what looked like the same pump-action shotgun. Bait money and a shotgun shell then turned up in petitioner's home.

## VI.

The petition for habeas corpus is denied.

So ordered.